# MYRTLE DORSEY SCHWAB

## *vs.*

## LEON H. SCHWAB.

### *Divorce—Value of Evidence—Cruelty.*

The value of evidence is determined not so much by its volume, or by the number of witnesses who contribute to it, as by its intrinsic probabilities, the character of the witnesses, their interest in the parties or the controversy, and the extent to which it is corroborated or contradicted by the physical or undisputed facts of the case, or by the testimony of witnesses, and its consistence with other evidence in the case. p. 49

It appearing that defendant, her husband, abused plaintiff by calling her vile, obscene, and vulgar names, that he falsely charged her in the presence of others with having had illicit relations with him and other men before their marriage, and with adultery, that he struck and beat her, and that he subjected her to unnecessary suffering and distress by dressing, at meal times, certain sores and wounds which he had as a result of disease and operations, *held* that plaintiff was entitled to a divorce *a mensa et thoro.* pp. 51-60

*Decided June 27th, 1923.*

Appeal from the Circuit Court of Baltimore City (CARROLL T. BOND, J.).

Bill by Myrtle Dorsey Schwab against Leon H. Schwab for a divorce. From a decree dismissing plaintiff's bill, and also a cross-bill filed by defendant, plaintiff appeals. Reversed in part and affirmed in part.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Albert S. J. Owens* and *Philander B. Briscoe,* with whom were *Briscoe, Jones & Martin* on the brief, for the appellant.

*Lee I. Hecht* and *Webster C. Tall,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

On November 2nd, 1914, Leon H. Schwab and Myrtle Dorsey, both natives and residents of Baltimore, were married by a Presbyterian minister in Philadelphia. He was a Jew and she a Gentile. He was forty-nine years old and she twenty-six. Notwithstanding the disparity in their ages and their racial difference, their domestic life was quiet, peaceful, and happy for at least two years. His means did not then permit them to keep servants, and she did the household work. He on the other hand was energetic and industrious, and worked hard at his business.

This tranquil and pleasant picture of domestic concord was unfortunately not permanent, and in November, 1916, an incident occurred which abruptly and rudely shattered their hopes of wedded happiness. Mrs. Schwab at that time noticed an eruption or rash on her knee. It proved troublesome and stubborn and she sent for a physician. He came and found that she was suffering from syphilis in its tertiary stage. She was treated by him for that disease and completely recovered, and in the following May, the first and only child of the marriage was born, normal and free from disease. Whether justly or not, Mrs. Schwab believed that she had been infected with the disease by her husband, and refused to have further marital intercourse with him.

From that time discord and strife displaced their former pleasant relations, and their home life was embittered by constant quarrels, which culminated on February 8th, 1921, when Mrs. Schwab filed in the Circuit Court of Baltimore City the bill of complaint in this case, in which she prayed to be divorced *a mensa et thoro* from the defendant and to be given the custody of the child, on the ground that he had

treated her so cruelly that her health both of mind and body had been broken. The defendant answered, denying the charge of cruelty, and he then filed a cross-bill charging the complainant with cruelty, and also praying for a limited divorce and the custody of the child. After testimony and a hearing, the court dismissed both bills, gave the custody of the child to the mother, and directed the defendant to pay ten dollars a week for its support. From that decree the complainant has taken this appeal. The issues presented by the appeal are almost purely questions of fact, since at this day there can be little room for differences of opinion as to what is the legal definition of "cruelty" as used in the statute. Article 16, section 38, Code Pub. Gen. Laws of Md.

In her bill of complaint, the plaintiff charges that the defendant treated her harshly and cruelly, assaulted and beat her, threatened her life, and humiliated her by falsely charging her before her friends with illicit relations with other men, and that his cruel treatment was constant and continuous. The facts thus alleged, if true, are sufficient to entitle the complainant to the relief prayed. *Ricketts* v. *Ricketts,* 4 Gill, 109; *Lynch* v. *Lynch,* 33 Md. 328; *Levering* v. *Levering,* 16 Md. 219; *Hawkins* v. *Hawkins,* 65 Md. 108; *Sharp* v. *Sharp,* 105 Md. 581; 19 *C. J.,* p. 53, 51; 9 *R. C. L.* 346.

The real question in the case therefore is whether these facts are established by the evidence. In passing upon that question, it may be said that the value of evidence is determined not so much by its volume, or by the number of witnesses who contribute to it, as by its intrinsic probabilities, the character of the witnesses, their interest in the parties or the controversy, and the extent to which it is corroborated or contradicted by the physical or undisputed facts of the case, or by the testimony of witnesses, and its consistence with other evidence in the case.

The charge of cruelty made by the complainant involves the assumption of some of these facts: (1) That the de-

fendant infected the plaintiff with a loathsome and dangerous venereal disease, (2) that he abused her by calling her vile, obscene, and vulgar names, (3) that he humiliated and insulted her by falsely charging her in the presence of others with having had illicit relations with him and other men before her marriage and with adultery, (4) that he struck and beat her, and (5) that he subjected her to unnecessary physical suffering and distress by the manner in which he attended and dressed certain sores and wounds which he had as a result of disease and operations. The evidence relating to these several issues of fact is, as is usual in cases of this character, conflicting and voluminous.

It may be said at the outset that, while there is no evidence in the case sufficient to justify a finding that the appellee ever had, or infected the appellant with, syphilis, it does show facts sufficient to have justified the appellant's suspicion that he had infected her and to justify her refusal to resume marital relations with him.

There is no dispute, and upon the record there could not be, as to these facts.

There was no way known to her in which Mrs. Schwab could have contracted the disease, except through her relations with the defendant. Again, she asked him to have a blood test made to ascertain if he then was infected with the disease, and he refused, and it was not until nearly a year later that such a test was made and then, not at his request, but apparently upon the initiative of the physician who was treating him for diabetes, and it is not clear that the defendant knew even then what test was to be made. His willingness to resume marital relations with his wife, after he knew she had been infected with the disease, and that he did is not denied, was in itself a suspicious circumstance, first because it indicated that he knew that the infection was not due to her misconduct, and again because it showed an absence of any fear that he might contract the disease, which would not have been natural unless he had known the source of her infection.

These facts, as we have said, were sufficient to justify the plaintiff's suspicions, and also to justify her refusal to have further physical relations with the defendant, but they were not sufficient to support a conclusion that he then had or had ever had the disease. The medical testimony as to that fact was meagre, groping and inconclusive. One of the means adopted for detecting the presence of syphilis in the blood is known to medical science as the Wasserman test. In the defendant's case that test was repeated three times and each time was negative, indicating that he did not then have the disease, but that result did not conclude the possibility that he did not have it then; it was but an indication that he did not and that was all. It also indicated that he had not previous to that time had the disease, unless he had been treated for it before the test; if he had been so treated then the fact that the test was negative was without any positive significance in determining whether he had ever been infected prior to treatment.

It cannot therefore be said as a matter of fact that he had ever had the disease, or that he infected the plaintiff, and the charge of cruelty, which depends upon the assumption that the complainant was infected with the disease by the defendant, falls.

The next question is whether the defendant abused and insulted the complainant, as charged in her bill. Before considering the evidence relating to these issues, we will refer to the physical condition of the parties from 1916 to the filing of the bill.

The defendant, as has been said, suffered from diabetes. Some time in the year 1917, it affected his left foot, gangrene set in and the foot was amputated in December, 1917. In 1919 he began to have trouble with his other foot and in February, 1920, the toes of that foot were amputated. After his last operation, Schwab was very much crippled, could get about with difficulty, and constantly needed help. Mrs. Schwab was also from time to time in bad health. She had

an attack of influenza in 1919 and in 1920 she was operated on for appendicitis.

The specific charges made by the complainant against the defendant are that he frequently cursed her, called her vile and obscene names, and falsely accused her of immorality and adultery, and that this conduct so affected her health that she was unable to continue to live with him.

It would be a profitless and needless thing to burden this opinion with any extended or detailed analysis of the evidence concerning these issues, it is enough to state its effect. And in order that the weight of the corroborative testimony and its relation to the issues may appear, we will first state the different versions of their conduct and troubles given by the respective parties to this case.

Mrs. Schwab testified that her husband had never treated her "as a wife;" that he had called her vile names, unnecessary to repeat here; that on several occasions, in the presence of others, he had said that she had gone to Atlantic City with him prior to her marriage as his wife, which was untrue; that he had falsely accused her of undue intimacy with another man; that in September, 1920, he struck her, bruised her, hit her with a crutch, and talked brutally to her; that in May, 1919, he struck her and pushed her head around until he "strained" her neck so that she had to send for a physician; that he struck her a number of times; that he "swore" at her; that on one occasion, when she had been on a visit to her mother and had returned, he had locked her out of her home, and she had gotten an "officer" to "break in," that later, when Mr. Schwab came she was afraid to let him in, and he had stood in the hall and cursed her and told her that if she did not open the door he would kill her, and that the next morning she had him arrested; that after she had been operated on for appendicitis and before the wound caused by the operation had healed, as she was passing him on one occasion, he kicked and struck her on the wound, which made her very sick; that he quarreled with her continually over

money; that he gave her no money and stopped her credit, although he spent much of his time at his club gambling; that he repeatedly told her to get out that he wanted to marry a "Jewish lady;" that after he had been operated on it was necessary to dress his foot, and that he would do that in the living room adjoining the dining room, and separated from it by a curtain, at meal times, and that the odor from the wound and from the ether which he used made her violently ill. She further testified that as a result of this conduct of the defendant she lost weight, was continually nervous and could not sleep, and that her health was "broken down completely."

Leon H. Schwab, in his testimony, after denying that he had committed any of the acts with which he was charged, said that he had visited his wife about four years before he married her; that she continually "worried" him to marry her; that, to quote him, he told her: "There is a vast difference between our ages and you know besides that I am a man that is not fixed financially to marry. Your idea of going about and at my age now I do not feel very much like going about any more and visiting these restaurants and things of that kind, and, a very important thing, I am a man that has diabetes, and you know it. That is costing me a good deal of money, and I said, as far as you and gentile is concerned, that does not enter my mind at all. It is only those things and the vast difference in our ages. I am a man that is sickly and I am not fixed financially to give you what I would like to give you, but above all and everything, I would not marry you until I would consult my mother. She is the one I want to consult. Well, I said I would let her know. I put it off as long as I possibly could until at last she kept on asking me and asking me, worried me continually until I said, well, I am going home and ask my mother what she thinks of it. I am very much in love with the young lady and became fascinated with her, and my mother simply told me—— Q. Not what she told you? A. I told her she was a gentile and

it did not make any difference." He further said that they lived very happily together until Mrs. Schwab learned that she had been infected with syphilis, and that even after that they got along very well until 1918, the year after he lost his left foot, that Mrs. Schwab nursed him and cared for him during his affliction until she went to Atlantic City with her child in 1918; that following her return her manner changed; she became abusive, called him vile names, drank to excess, insulted him because of his race, and that in 1920 she left him and again went to Atlantic City without letting him know where she was; he sent her money to return and she did return some time later; that she repeatedly cursed him before their child; smoked cigarettes, attended the races frequently, would come home drunk; that against his protest she twice visited a questionable entertainment known as the "Bal des Arts," and that on one occasion an incident occurred which he thus describes: "Mrs. Schwab actually hollered 'murder,' and hollered very loud. I rapped at the door and wanted to get my breakfast, and Mrs. Schwab would not answer. I rapped louder and received no answer and kept on rapping, and she then said, 'You Jew son of a bitch, if you don't leave this place, why, I will fix you, I will fix you, and she deliberately hollered 'murder' as loud as she possibly could. I left then and went in my living room there." These descriptions of their married life, given by the parties themselves, differ in every essential but one, that their married life was for some time before their separation an intolerable affliction for both of them. The facts given in the testimony of either of them would be sufficient if true to warrant the court in granting the relief respectively prayed by them in the bill and cross bill. The case therefore turns upon the point as to whether the story told by either party is substantially correct.

We have examined with care all the testimony in this case in connection with that issue, and as a result we have reached the conclusion that Mrs. Schwab has fairly met the burden she as complainant assumed and that she is entitled to the

relief prayed in her bill.   Our conclusion rests upon these
grounds:  First, her story is in its most essential particu-
lars corroborated by the positive testimony of disinterested
witnesses; second, it is more inherently credible and prob-
able then that of the defendant; third, the evidence impeach-
ing it is not so strong as that impeaching the defendant's
testimony; and fourth, it is to an extent corroborated by the
physical and admitted facts of the case.

Mildred Harris, a friend, who visited Mrs. Schwab in
January or February, 1921, said that Mr. Schwab in her
presence insulted his wife and accused her of having been
intimate with him and another man before their marriage,
and that he called her vulgar and obscene names; Louise
Coleman, a domestic, employed by Mrs. Schwab at different
times between 1917 and 1921, said that Mr. Schwab cursed
his wife, called her vile names and to quote from her testi-
mony:  "Called her 'most anything' when he got ready, cursed
and carried on, whooped and hollered, from the time I got in
in the morning until he left, and the only time you did not
hear him holler was when he was at work.   When he was at
work he would call up and carry on over the telephone.' "  She
never actually saw him strike his wife, but she heard her
"holler."   Bertha Adams, a domestic, employed in the house
for six and a half months in 1919, testified that Schwab
cursed his wife, called her vile names, "yelled" at her, and
that "they would have a contention every evening about din-
ner time.   He would start fixing his foot, and he had a terri-
ble odor to his foot, and he could not help that, and she would
ask him why he did not do it in the middle of the day or after
dinner, and he started about meal time, and no one could eat
anything, and then he would swear at her because she would
get after him about that.   He would fix his foot and put his
hands in the food and sit at the table and eat with his fing-
ers."   She never saw the defendant strike his wife, but she
saw bruises on her neck.   Lelia Cole, a domestic, testified
that she was employed in the Schwab home in the fall of 1920

and that she also heard him curse and abuse his wife, call her vulgar names, and tell her "to get out," and she also heard the conversation referred to by Mrs. Harris, and that he "often fixed his foot," as some of those other witnesses said, at dinner time. "On one occasion he did it when they had company, and one of the ladies was taken sick after that. I don't know whether it was the ether or from his foot or what, but I do know she left the table sick." Carrie Kennard, a domestic in the home in 1919, said: "Well, Mr. Schwab acted ugly sometimes. I heard him tell her to get out, and he would not leave her a damned cent, neither her nor Doris, when he made his will. What else? Lots of other things that I really cannot recall, because I never liked to stay in there and listen to such talk as that. What other words did he use towards her? He told her she was not any good, she was not any good when he married her, and told her to get out, and that was his home." Mrs. Marie W. Ruppersberger, a friend, said that she had heard him tell his wife to get out, and that one evening, when she had dinner out there, Mr. Schwab got up from the table and went in and attended to his foot. He would get right in front of the table in the living room and attend to his foot, and she was invited to dinner. It made her so nauseated she had to leave. Mrs. Esther M. Albaugh, a friend who for a time lived in the same apartment house, testified: "I have heard Mr. Schwab tell Mrs. Schwab on different occasions that if she did not like the way she was living there she could get out, and on one occasion, well, it was about three or four months and possibly five months before she left him, he told her she could get out, and he could go to his sister's and he was going to marry a nice Jewish lady. He told her that right in my presence. * * * I have heard him call her a dirty hussy more than once." She also said she had seen Mrs. Schwab when her neck and shoulder were bruised and scratched. Mrs. Harry A. Jones testified: "What noise would you hear? A. Mr. Schwab would start cursing Mrs.

Schwab. Q. What words would he use? A. Damned son of a bitch and hussy. Q. Would he call Mrs. Schwab those names? A. Yes; that was her pet name. I have gotten perfectly rigid lying in my bed. That was not only once, he would keep it up by the hour. I bet he has kept that up for an hour and a half at one time. (The Court): When he came in? (The Witness): From 2 o'clock to 4 in the mornisg; he would get up about 7 o'clock and start. One time she was sick, and she had a maid, and there was no need for her cooking breakfast—— What did you hear? I heard hammering on the door, wanted her to get up. He said, 'Get up, get up,' and I don't know what she said. He said, 'I got you here to cook my breakfast and that is what I got you for.'" Mr. and Mrs. Robert M. Golder, who lived in a nearby apartment, on one occasion, heard Mrs. Schwab screaming "murder" and Mrs. Alma M. Cox, her mother, testified that she had seen bruises on her daughter's body, and all these witnesses testified that the complainant's health declined, she became nervous, "upset" and ill. They also testified that her conduct towards the defendant was good; that on one occasion she shaved him, dressed his sores, attended to his needs, and when able got his meals when necessary and cared for his home and child.

Opposed to this testimony was that of William Butler, janitor of the apartment house. John H. Caulfield, a nurse, whose testimony was immaterial. George H. Dunsing, a chauffeur, who for a number of months drove the defendant to and from his office, testified that he had frequently heard the complainant abuse and curse her husband. The testimony of this witness is not convincing, as will appear from this extract from his testimony: "You mean to say that counsel for Mr. Schwab or no one on their behalf said anything to you about this case before you went on the stand? A. As true as God is in Heaven. (The Court): Your previous question was, before he came to court * * *. . (The Court): Now, you are asking him, before you came on the

stand here this morning did anybody talk to you? (The Witness): No, sir, I had not seen Mr. Hecht this morning until he walked in this door. (The Court): Yesterday after you came to court. (Mr. Hecht): You came into court yesterday and I saw you? (The Witness): Said to me this morning or yesterday? Q. Any time before you went on the witness stand? A. No one was at my house last night, but Mr. Hecht asked me yesterday—I came in here yesterday, and if you will remember it—I guess the Judge does—that I stood at the door two or three minutes to see whether I was in the right place, and there was nothing said to me until lunch time, when Mr. Hecht and Mr. Schwab came over and spoke to me, and Mr. Hecht told me I was on this case and I told him I really could not lose my work, and he said he would put me on the stand immediately after dinner, and my boss was awful put out about it because I lost yesterday afternoon's work. That was all that was said." The testimony of Felix Duntan, another janitor, was of no consequence. Mary Butler, the wife of William Butler, the janitor, testified that on one occasion Mrs. Schwab asked her to get breakfast for the child, as "she was out with some ladies drinking, and Mr. Schwab called the doctor and the doctor said she had ptomaine poisoning." Alex. Spencer, the defendant's chauffeur, gave this testimony: "One time I heard Mrs. Schwab say—she called him a darned old fool and she would say, 'You are crazy,' and I did see Mrs. Schwab once throw some water on him. Q. What was the occasion? A. And another time there was water on him and he came to the door and I was standing outside and he called me to him and asked me to wipe the water off. He said, 'Mrs. Schwab throwed water on me, and I laughed.'" There was also testimony relating to the police court incident; testimony to contradict the complainant's statement that the defendant's family disliked her and that she did not visit them; and also testimony showing that Schwab was not able in May, 1919, to get about without crutches. There was also the testimony of Charles

H. Fink, a private detective, intended to show that Mrs. Schwab was intoxicated at the "Bal des Arts." This witness testified that he attended that entertainment to watch Mrs. Schwab and that he had been first employed by her husband for the purpose of watching her in 1920, that at the "Bal des Arts" in 1922 he combined the duties of a detective with those of an assistant dispenser of various intoxicating liquors provided for the comfort and pleasure of the patrons of the ball and he described the delicate nature of his trust in this way: "Well, I will tell you—*it* its pretty hard for me to answer that question without incriminating some one else, and I will answer it just as brief as I can. Under certain conditions—of course, they cannot allow it to go on in these balls openly. They have a pass word, and in order to get any liquor they have got to give this pass word, of course. If there was too many up there you had to hold them down until a certain amount got out, and when there was room for them it was up to me to leave the others up. Q. Did you leave Mrs. Schwab up? A. Yes. Q. Did she have the pass word? A. Yes." The testimony of this witness is obviously not worthy of serious consideration, and it is contradicted by the testimony of Mrs. Ruppersberger and Mrs. Albaugh, who both said that Mrs. Schwab, who went to the ball with them, was not intoxicated on that or any other occasion known to them.

Considering the character of the witnesses, their opportunities of observation, and their interest in the parties to the cause, in our opinion, the evidence to which we have referred is sufficient to show that the defendant's treatment of the complainant was such as to entitle her to the relief prayed in her bill and notwithstanding the defendant's evidence. Not only did his attempt to show that his wife drank to excess, that she abused him and insulted him and disregarded his wishes, fail, but he utterly failed except by his own testimony to contradict her testimony and that of her witnesses as to his own misconduct, and two communications written by him in 1917 and 1920 to his wife are quite incon-

sistent with his testimony concerning her treatment of him. In them he said: "I am missing you. I ain't got anyone to fight with. Rowe treated us to dinner today. Invited tomorrow night for supper at his house. Saw the worse show tonight. $5 for two tickets. Regards Hunt. Brady. Albaugh. Leon. * * * I heard from your mother that you are sick and confined in bed. I assure you that I was sorry to hear of it. I trust that you are better by this time. Now, Myrtle it is about time to come home. Let us forget the past. Start life in the right way. I have been wrong, so have you. We cannot live this way. It will be better for both of us, in health and everything else. There is a child in consideration, don't mar her future. I certainly feel obligated to Mrs. Harris and daughter, as I hear they have been so nice to you and Doris. Besides taking care of both of you for this length of time, they certainly think a whole lot of you and Doris." His testimony is contradicted in material particulars by a number of witnesses. For instance, he denied that when the baby was born he had asked if it were blind, but Margaret L. Boyle, the trained nurse who attended Mrs. Schwab, Mrs. Cox, her mother, and Mrs. Schwab, all testified that he did ask that question. Again, he said that he ordered his wife not to go to the "Bal des Arts," but Mrs. Schwab, Mrs. Ruppersberger and Mrs. Albaugh flatly contradicted him, and say he gave her permission to go. He was also contradicted by disinterested witnesses in his testimony as to the time and the money he spent at his club.

Viewing the entire evidence, in our opinion, it is sufficient to entitle the complainant to be divorced *a mensa et thoro* from the defendant. The acts complained of and proven were not isolated or sporadic, but constant over a long period of time, and of such a character as to wreck the health and happiness of a person of ordinary sensibility, and we are aware of no principle of law which can be invoked to compel a wife to suffer without remedy conduct so humiliating and injurious. *Outlaw* v. *Outlaw,* 118 Md. 498.

It follows that so much of the decree appealed from as dismisses the complainant's bill of complaint must be reversed, and so much thereof as dismisses the defendant's cross-bill and grants the custody of the child, Doris Schwab, to the appellant, and directs the appellee to contribute ten dollars a week to its support will be affirmed, and the cause remanded in order that a decree divorcing the appellant *a mensa et thoro* from the appellee and awarding her suitable alimony may be passed.

> *Reversed in part and affirmed in part, and cause remanded for the passage of a decree in accordance with the views expressed in this opinion, with costs to the appellant.*